KINDRED OF NORTH CAROLINA, INC., AND VICKIE L. KINDRED, PLAINTIFFS v. PAULINE S. BOND AND BOND CARPET & FLOOR COVERING, INC., DEFENDANTS

No. COA02-898

(Filed 2 September 2003)

**1. Fraud; Unfair Trade Practices—negligent misrepresentation—sale of business**

The trial court did not err in a fraud, unfair and deceptive trade practices, and negligent misrepresentation case arising out of the sale of a carpet business by entering judgment upon the jury's verdict even though defendants contend it was inconsistent on its face based on the fact that the jury had answered the question of whether defendant had made any misrepresentations in the negative when it was contained in the unfair and deceptive trade practices questions and in the affirmative in the negligent misrepresentation questions, because: (1) the trial court properly instructed the jury before their deliberations began, and the jury followed those along with the later

instructions; and (2) there was no abuse of discretion in the manner the trial court handled the situation, especially in light of the acquiescence of defense counsel.

## 2. Fraud—negligent misrepresentation—motion for directed verdict

The trial court did not err by denying defendants' motion for directed verdict on plaintiffs' claims for negligent misrepresentation during the sale of a carpet business arising from the failure of defendant business owner's profit and loss statements to properly account for an employee's salary, because: (1) plaintiff purchaser did not fail to undertake an effort to investigate the financial statements so as to destroy her reasonable reliance; (2) there was enough evidence for the jury to believe that plaintiff was justified in relying on the financial statement as she was not at arm's length with the information, but had to rely on what was provided her; and (3) defendant owed a duty to provide accurate financial information to plaintiff when they were involved in a business transaction in which defendant was the only party who had or controlled the information at issue, and defendant had a pecuniary interest in inducing plaintiff to purchase the business.

## 3. Costs—attorney fees—default on promissory note

The trial court erred in an action arising out of a default on a promissory note by denying defendants' motion for attorney fees, because: (1) N.C.G.S. § 6-21.2 allows for an award of attorney fees in actions to enforce obligations owed under an evidence of indebtedness that itself provides for the payment of attorney fees; and (2) the parties' promissory note stated that defendants were entitled to attorney fees equal to fifteen percent of the outstanding balance owed on the note.

## 4. Negotiable Instruments—security agreement—possession of collateral—money owed on promissory note

The trial court did not err by entering judgment both for possession of property and for money owed on a promissory note in an action arising out of the sale of a carpet business, because: (1) although plaintiffs contend defendants failed to prove any right to possession of the collateral under the security agreement, the issues of perfection and priority are irrelevant in disputes between the debtor and the secured party; (2) a valid security interest was created and had attached to the collateral when

evidence showed that the security agreement was signed and proper, value was given through the transaction, and the debtor took possession of the collateral; (3) the fact that the trial court gave plaintiffs forty-five days to satisfy the money judgment without having to give up collateral seemingly gave plaintiffs a redemption period; and (4) fears of double recovery are unfounded when defendants are only entitled to the amount of the judgment.

Appeals by plaintiffs and defendants from judgment entered 24 September 2001 by Judge James W. Morgan in Mecklenburg County Superior Court. Heard in the Court of Appeals 24 April 2003.

*John E. Hodge, Jr., for plaintiff appellants/appellees.*

*Templeton & Raynor, P.A., by Kenneth R. Raynor, for defendant appellees/appellants.*

McCULLOUGH, Judge.

Defendant Pauline Bond started defendant Bond Carpet & Floor Covering, Inc., in 1994. She used her own money to start the business. She was the president, treasurer, sole shareholder and director. Her duties were mostly bookkeeping and administrative. In 1998, she employed her sons, Rick and Tommy, and one other employee full-time. Her grandson, Ricky, worked part-time. Rick was the general manager and principal employee, as he had been in the carpet business for over 20 years.

In 1998, Ms. Bond decided to sell the business. She hired Clontz Commercial Investments, Inc., as her sales agent to assist in the selling process.

Plaintiff Vickie Kindred was the operations manager of Cowper Construction Company in 1998. She wanted to own her own business again. In early 1999, she saw an advertisement for defendant's business. She contacted Clontz and signed a Disclosure to Buyer from Seller's Agent form. On 21 January 1999, Ms. Kindred met with Clontz and received a packet which included information on Bond Carpet, sale terms, an executive summary, and unaudited financial statements for 1995-97. Ms. Kindred was not interested at first. Clontz arranged a meeting between all parties.

On 27 January 1999, Ms. Kindred, Clontz, Ms. Bond and Rick Bond met at Bond Carpet. Ms. Kindred asked for current financial

information from Ms. Bond. Ms. Bond printed a profit and loss statement off Quick Books, the software that she used to keep the business's books. Ms. Bond had been trained on Quick Books, but also stated that she was not the best bookkeeper. The profit and loss statement showed payroll expenses of $56,747.48 and a net income of $23,760.74. Rick's salary was discussed, where it was revealed that he was paid $605.00 per week, or approximately $31,000.00 per year.

On 1 February 1999, Ms. Kindred took the financial information on Bond Carpet to her accountant. Her accountant urged her to get the 1998 tax returns. Ms. Kindred told him that she had asked for them, however, Ms. Bond informed her that she had not given her accountant the information yet. Thus the tax returns were not completed. In fact, Ms. Bond had indeed sent this information to her accountant the day before the parties met on 26 January 1999. With her accountant, Ms. Kindred formulated an offer after developing a comprehensive business plan. Notably, this business plan did not envision the business retaining its retail business, or most of the current employees. After requesting and receiving additional information from Clontz, Ms. Kindred had Clontz explain to her the method that was used in arriving at the asking price of $190,000.00. It was similar to the method used by her accountant to develop the offer price.

On 15 February 1999, Ms. Kindred made an offer of $150,000.00. This was declined. Clontz suggested something with a non-compete clause for Ms. Bond, Rick and "Lonnie." Ms. Kindred, not hearing of Lonnie before, became concerned. She was concerned about how he was paid. Ms. Bond explained that Lonnie was called Tommy, and he was paid through the payroll system. Rick, on the other hand, was paid as subcontract labor. Rick was also the company's highest paid employee.

Finally, an agreement for $165,000.00 was reached. An Asset Sale and Purchase Agreement was signed by all parties by 6 March 1999. On 25 March 1999, Kindred of North Carolina was incorporated. The parties closed on 30 March 1999. Ms. Kindred paid Ms. Bond $55,000.00 in cash, while Ms. Bond financed the remaining $110,000.00 by a promissory note. Ms. Bond was granted a security interest in various business property conveyed.

According to plaintiff, problems surfaced immediately. Rick did not show up for work, while Ms. Bond had gone through and removed

numerous files dealing with the customers, vendors and ongoing projects. She claimed they belonged to her. She also changed the password on the Quick Books software so that Ms. Kindred could not access them. She refused to divulge the password. In April 1999, Ms. Kindred had an accountant come in and update the Quick Books. This required backing up the old program, and Ms. Bond relinquished the password for this purpose.

Once this information was obtained, Ms. Kindred investigated Rick Bond's salary. There was no entry under subcontract labor or payroll indicating how Rick's salary was handled.

Rick was eventually terminated on 26 May 1999. On this day, Ms. Kindred, Ms. Bond and Rick met, at which time Ms. Bond admitted that Rick was paid as a draw. Ms. Bond said that she would have to get her accountant to explain. The next day, however, Ms. Bond came in and again changed the passwords.

Ms. Kindred then investigated her backup copy on 8 June 1999. She printed out statements and took them to her accountant. As of 23 June 1999, Ms. Bond still would not return phone calls or grant requests to see the now completed 1998 tax return.

On 2 July 1999, the parties met as it was time for the first installment on the promissory note. Ms. Kindred tried again to go over the salary information she and her accountant had prepared. Ms. Bond exclaimed that, "You're just upset because you didn't get what you thought you were getting." Plaintiff agreed, while also tendering the installment check. She filed suit on 27 August 1999, before the second installment was due.

Only after Ms. Bond's deposition did Ms. Kindred first learn that the financial statements she had received from defendants did not include Rick's salary at all. Eventually it was determined, with the help of defendants' accountant, that defendants had characterized the salary of Rick as a distribution of equity to the owner. This is what Ms. Bond had referred to as a draw. She would pay herself, and then pay Rick, tax free.

According to Ms. Bond's accountant, these "draws" showed up in the expense column of the profit and loss statement for 1998 that he was given on 26 January 1999. These draws added up to $33,295.24, and were taken out in checks equal to Rick's salary. The accountant believed that Ms. Bonds was distributing earnings to herself. If it were a salary, it should have been in payroll. The payroll total was

$56,747.48, and was the largest expense on the statement. According to the accountant, the company had a loss of $9,534.50.

Ms. Kindred alleged that Ms. Bond had falsified the books. The profit and loss statement that she received on 27 January 1999 showed that the company was turning a $23,760.74 profit. However, the profit and loss statement the Bond's accountant had, printed out 26 January 1999, showed a $9,534.50 loss. The difference reflected the salary to Rick, totaling $33,295.24 [$23,760.74 (profit) + $9,534.50 (loss) = $33,295.24]. Had the $33,295.24 been reported as a salary with withholdings and social security paid, according to one expert, the company would have shown a loss of $18,916.00.

Ms. Kindred's amended complaint of 30 March 2000 alleged causes of action for fraud, unfair and deceptive acts or practices in commerce, and negligent misrepresentation based upon material misrepresentations and non-disclosures in connection with the sale of the business. Defendants counterclaimed on the promissory note, guaranty (Ms. Kindred had assigned the note to her business and assumed the role of its guaranty), conversion, unfair and deceptive trade practices, possession of property, and breach of contract. The case was tried during the 25 June 2001 Civil Session of Mecklenburg County Superior Court. The jury found that plaintiffs were damaged in the amount of $60,000.00 by the negligent misrepresentations of defendants. Both sides moved for costs, and defendants moved for judgment notwithstanding the verdict. Parties were heard on their respective motions on 31 August 2001. On 24 September 2001, judgment was entered. The trial court granted *nunc pro tunc* defendants' motion for directed verdict on its counterclaims on the note and guaranty in the amount of $45,000.00 (Balance of note [$105,000.00] minus damages [$60,000.00]) against plaintiffs. Both motions for costs were denied, as well as defendants' motion for JNOV. Defendants requested judgment on its possession claim, and the trial court denied the request as long as plaintiffs satisfied the money judgment within 45 days of entry of judgment. Defendants appealed on 24 October 2001, then plaintiffs cross-appealed on 5 November 2001.

Defendants make several assignments of error and present the following questions on appeal: (I) Was it prejudicial error for the trial court to enter judgment based on a jury verdict, as it was inconsistent? (II) Should the trial court have granted its motion for directed verdict on plaintiffs' claims for intentional and negligent misrepresentation? (III) Did the trial court commit prejudicial error by denying defendants' motion for directed verdict on plaintiffs' claim of

unfair and deceptive trade practices? (IV) Did the trial court commit error by denying defendants' motion for attorneys' fees based on the promissory note?

Plaintiffs make several assignments of error and present the following questions on appeal: (V) Did the trial court commit error in entering judgment 'both for possession of property and for money owed on the promissory note? (VI) Did the trial court commit error in excluding plaintiffs' exhibits 24 and 25?

I.

[1] Defendants first contend that the trial court erred by entering judgment upon the verdict of the jury as it was inconsistent on its face.

Once the trial had concluded, the trial court submitted several issues to the jury. These included fraud, unfair and deceptive trade practices, negligent misrepresentation, and punitive damages. The verdict form given to the jury reflected these claims: Questions 1-3 asked if plaintiffs had been damaged by any fraud by defendants and to what extent; Questions 4-7 were special interrogatories to the jury on the unfair and deceptive trade practices claim; and Questions 8 and 9 asked if plaintiffs had been damaged by any negligent misrepresentation by defendants and to what extent.

The jury answered the fraud questions in the negative. It also answered all the interrogatories pertaining to unfair and deceptive trade practices in the negative, including those which asked if defendants had misrepresented or failed to disclose certain information to plaintiffs. However, the jury responded in the affirmative to the question of plaintiffs being financially damaged by a negligent misrepresentation of defendants in the amount of $60,000.00.

Defendants argue that the jury's verdict was inconsistent and/or irregular as the jury answered the question of whether defendants had made any misrepresentations in the negative when it was contained in the unfair and deceptive trade practices questions and in the affirmative in the negligent misrepresentation questions. According to defendants, the trial court was required by N.C. Gen. Stat. § 1A-1, Rule 49(d) (2001) to enter judgment on the special findings in the questions pertaining to unfair and deceptive trade practices, or in the alternative, had a duty not to enter a judgment on the jury's verdict finding defendants liable for negligent misrepresentation. *See Edwards v. Motor Co.*, 235 N.C. 269, 69 S.E.2d 550 (1952).

However, the context from the transcript tends to put the jury's answers into perspective. After deliberating for a period of time, the jury asked the trial court a question: "Which questions refer to fraud and unfair and deceptive trade practices and which questions refer only to negligent misrepresentation[?]" The trial court brought the jury into the courtroom and told them which questions pertained to which cause of action: "questions 1, 2 and 3 refer to fraud; 4, 5, 6 and 7 refer to unfair and deceptive trade practices; 8, 9, 10 and 11 refer to negligent misrepresentation." Each party agreed that this was proper. Later, the jury asked the trial court another question, and the following took place:

> THE COURT: We have another question. *Can we answer no to all of the questions 4, 5, 6, and 7 and still find the Defendant liable on question 8 for amount of damages?*
>
> Why don't we just let the bailiff tell them yes, or do you want to bring them out.
>
> [PLAINTIFF'S ATTORNEY]: Telling them the answer is okay with me.
>
> [DEFENDANT'S ATTORNEY]: Yes, sir.
>
> THE COURT: Just tell them yes. All right.

It appears that the jury knew exactly what it was doing, and was not confused in the least. The trial court properly instructed the jury before their deliberations began, and the jury followed those along with the later instructions. There does not appear to be an abuse of discretion here in the manner that the trial court handled this situation, especially in light of the acquiescence of defendants' trial counsel.

This assignment of error is overruled.

## II.

[2] Defendants next contend that the trial court erred by denying their motion for directed verdict on plaintiffs' claims for negligent misrepresentation.

"Upon motion for directed verdict made by defendants, the question before the Court is whether the evidence offered by plaintiff, when considered in the light most favorable to plaintiff and allowed the benefit of every reasonable inference which may be drawn there-

from, is insufficient as a matter of law for submission to the jury." *Libby Hill Seafood Restaurants, Inc. v. Owens,* 62 N.C. App. 695, 697, 303 S.E.2d 565, 567-68, *disc. review denied,* 309 N.C. 321, 307 S.E.2d 164 (1983); *see* N.C. Gen. Stat. § 1A-1, Rule 50(a) (2001).

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988).

According to defendants, plaintiffs' evidence failed to establish that they justifiably relied upon any false statement made by defendants. Plaintiffs' claim arises from the failure of Bond's profit and loss statements to properly account for Rick Bond's salary. However, defendants point out that Ms. Kindred found out that those statements were incorrect during the Tommy/Lonnie confusion. In spite of this, Ms. Kindred made no further investigation into the books. All Ms. Kindred had to do in this respect was request a copy of Bond's Quick Books disk, which would have revealed all checks and deposits for the years involved. Alternatively, she could have sent the disk to her own accountant, as Ms. Kindred does generally the same thing with her Quicken software.

Defendants cite *Libby Hill* as an analogous case. *Libby Hill,* 62 N.C. App. 695, 303 S.E.2d 565. In *Libby Hill,* the plaintiff was suing the seller of realty for misrepresentation. *Id.* at 697, 303 S.E.2d at 567. The agent of the seller made a comment about the integrity of the land, as it was formerly a landfill. *Id.* at 699, 303 S.E.2d at 568. The comment was that the landfill ended "approximately" 20 feet inside the rear property line. *Id.* This turned out to be untrue, and the plaintiff built a restaurant over land that was formerly landfill, and it crumbled. *Id.* at 696, 303 S.E.2d at 567. This Court found that the plaintiff could not justifiably rely on the vague statement by the agent knowing that the agent got his information from an independent report of which plaintiff could have availed himself. The agent was not a professional in these matters, and plaintiff was on equal footing to have hired its own expert to test the ground before investing large sums of money. *Id.* at 699-700, 303 S.E.2d at 568-69. This Court explained: " 'The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him. The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encour-

age negligence and inattention to one's own interest.' " *Libby Hill*, 62 N.C. App. at 700, 303 S.E.2d at 569 (quoting *Calloway v. Wyatt*, 246 N.C. 129, 134-35, 97 S.E.2d 881, 886 (1957)).

In the present case, when Ms. Kindred raised her concern about Tommy/Lonnie, the situation was explained to her by the only ones that could have known. Bond Carpet was a small business that was closely held and operated by the Bond family. Ms. Kindred was arguably put on notice that the bookkeeping was suspect by Ms. Bond's own admission, and the fact that defendants had difficulty explaining the salary situation prior to sale. Yet these were the only people who knew. Further investigation was something that Ms. Kindred had been doing all during the negotiation process. The response from defendants was that they did not have the information, such as the case of the tax return. In fact, it was because of Ms. Bond's delay that the return was not available. Certainly, Ms. Kindred could not go to Ms. Bond's accountant and request such information, as he testified that he would not have provided it. The claim by defendants in their brief that all Ms. Kindred had to do was ask for more information is, to some extent, disingenuous. This is especially so considering their actions after the purchase. Thus, Ms. Kindred did not fail to undertake an effort to investigate the financial statements so as to "destroy" her reasonable reliance.

Further on the issue of reliance, defendants point out that Ms. Kindred had a business plan for her purchase. In this plan, Ms. Kindred planned on discontinuing the retail operation of the business and no longer employ Rick and Tommy. Thus, their salaries were not relevant to the business plan. This, supposedly, explains why she did not discuss the missing salaries because she did not care. However, salaries affect the profit loss margin. They are certainly material to the bottom line, regardless of any business plan.

The evidence, taken in the light most favorable to plaintiffs, shows that Ms. Kindred based her offer on the information she had, with a focus on the 1998 financial statement. Before the offer was written and given to Ms. Bond, Ms. Kindred found out that Tommy was an employee. She was concerned about where Tommy's compensation was accounted for and what affect it had on the statement. She was told that Tommy was paid through payroll expenses and that Rick was paid as subcontract labor. It was explained that subcontract labor was "above the line" and that it did not affect the bottom line of the financial statement given to Ms. Kindred. This was a bad accounting practice but was consistent with Ms. Bond's confession that her

bookkeeping was bad and the accountant changed categories. In fact, this would have tended to increase the profit margin.

Given the factual nature of this determination and the standard of viewing the evidence in the light most favorable to plaintiff, the trial court was correct in denying defendants' motion for directed verdict as there was enough evidence for the jury to believe that Ms. Kindred was justified in relying on the financial statement.

Defendants also claim that they are entitled to a directed verdict on plaintiffs' negligent misrepresentation claim because they owed no duty of care to plaintiff Kindred. Defendants argue that this was a commercial transaction between parties of equal footing. They again cite *Libby Hill* for the proposition that the seller of a business does not owe a duty to provide information to the purchaser in a commercial transaction. We fail to find this statement of law in the *Libby Hill* opinion.

The question remains whether or not Ms. Bond owed a duty to Ms. Kindred to produce accurate financial information during the course of their negotiations of the sale of Bond Carpet.

Recent cases shed light on the issue of a duty to supply accurate financial information. An approach was adopted in *Raritan River Steel Co.*, 322 N.C. at 209, 367 S.E.2d at 612 (discussing the liability of accountants when providing negligent information). This approach was recently applied in a potentially instructive case, *Jordan v. Earthgrains Baking Cos.*, 155 N.C. App. 763, 576 S.E.2d 336, 340 (2003). Breach of duty owed in negligent misrepresentation cases has been defined as:

> ". . . One who, in the course of his business, profession or employment, or in any other transaction in which he *has a pecuniary interest*, supplies false information for the guidance of others in *their business transactions*, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information*."

*Jordan*, 155 N.C. App. at 767, 576 S.E.2d at 340 (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 218, 513 S.E.2d 320, 323-24 (1988)).

The facts in *Jordan* were that a CEO of a corporation visited a plant and spoke to its employees. *Id.* at 764, 576 S.E.2d at 338. The

employees alleged that the CEO told them that the plant was profitable and that their jobs were secure. *Id.* However, approximately five months later the plant was closed and essentially all the employees were laid off. *Id.* The Court in *Jordan* concentrated on several facts that the employees failed to show: "(1) [the CEO] was offering them guidance in a business transaction; (2) that the alleged information was false; (3) that [the CEO] had a pecuniary interest in inducing [employees] to continue employment; or (4) that [employees] were justified in relying on the alleged information." *Id.* at 767, 576 S.E.2d at 340. The CEO and the employees were not in a business transaction, as he was attempting to assuage the effect a recent stock announcement might have on the employees. The decision to close the plant was not made until after the visit. Neither the CEO nor the company had a pecuniary interest in the employees not leaving the company, and in fact it would have been financially better for the company had the employees left under the collective bargaining agreement at the time. Further, there was no justified reliance as the employees did nothing differently, such as decline other job offers.

Using the same factors as *Jordan,* it appears that Ms. Bond owed a duty to provide accurate financial information to Ms. Kindred. Ms. Bond and Ms. Kindred were clearly involved in a business transaction. The profit and loss statement given to Ms. Kindred by Ms. Bond for the year 1998 did not account for Rick Bond's salary. The statement to Ms. Kindred represented over $20,000.00 in profit, while in actuality the business was operating at an almost $10,000.00 loss. It is elementary that Ms. Bond had a pecuniary interest in inducing Ms. Kindred to purchase the business. Further, we have already held that Ms. Kindred was justified in relying on the alleged information as she was not at arm's length with the information, but had to rely on what was provided her.

We hold that, in the present case, Ms. Bond owed a duty to provide accurate, or at least negligence-free financial information to Ms. Kindred. *See also Libby Hill,* 62 N.C. App. at 698, 303 S.E.2d at 568 (while discussing misrepresentations regarding realty, stated that "where material facts are available to the vendor alone, he or she *must* disclose them"). Ms. Bond owed the same duty to respond truthfully to Ms. Kindred's information requests, as she was the only party who had or controlled the information at issue. Ms. Kindred had no ability to perform any independent investigation.

This assignment of error is overruled.

### III.

Defendants further contend that the trial court erred by denying their respective motions for directed verdict on fraud/intentional misrepresentation and unfair and deceptive trade practices. In light of the facts that we are declining to remand this matter for a new trial and that the jury found for defendants on these issues, we decline to address these arguments.

### IV.

[3] Defendants' final assignment of error contends that the trial court erred by denying their motion for attorneys' fees. The note provided:

> Upon default, the holder of this Note may employ an attorney to enforce the holder's rights and remedies, and the Maker, principal, surety, endorser, and guarantor, of this Note agree to pay to the holder reasonable attorney fees equal to fifteen percent (15%) of the outstanding balance due on the Note, plus all other reasonable expenses incurred by the holder in exercising any of the holder's rights and remedies due to the default.

Plaintiffs made the first payment due under the promissory note around the beginning of July. The next month, however, they filed the present lawsuit and never made another payment. As such, defendants declared plaintiffs to be in default after missing the 30 September 1999 payment. As allowed by the promissory note, defendants accelerated the debt upon default, and the total amount, plus interest, came to $106,812.32. Once plaintiffs filed suit against defendants for the various causes of action discussed above, defendants filed, among other things, a counterclaim to recover the balance owed under the promissory note. Defendants noted in their counterclaim, and plaintiffs admitted such in their reply, that on 11 October 1999, they sent a letter to plaintiffs notifying them that "if the amount claimed to be owed on the note was not paid within five days of the date of the letter [defendants] would seek to recover reasonable attorney's fees allowed by law in addition to seeking the payment of principal and interest under the note."

The parties agreed at the end of the trial that plaintiffs would only seek damages as its remedy, abandoning its alternative remedy of rescission. In doing this, the parties and the trial court agreed that the issue of breach of the promissory note would not be submitted to the jury, and the trial court reserved ruling on defendants' motion for

directed verdict on its counterclaim on the note until after the jury returned its verdict. The parties and the trial court further agreed that any damages awarded by the jury would then offset the amount plaintiffs owed on the note.

As mentioned before, the jury awarded plaintiffs damages in the amount of $60,000.00. In the judgment, the trial court granted defendants' counterclaims on the note, reducing the original amount by the jury award. This amount came to "$45,000.00, plus interest at the legal rate of eight percent (8%) per annum from and after September 30, 1999 until paid."

After the jury returned its verdict, but before it was reduced to judgment, the parties made their respective motions for costs. Defendants made a motion for costs on 6 August 2001 which included a request for "Attorneys' fees in the amount of $6,750.00 pursuant to the promissory note." The trial court denied defendants' motion for costs, in its entirety, in the judgment filed 24 September 2001.

Defendants argue that N.C. Gen. Stat. § 6-21.2 controls in the present case and mandates reversal of the trial court's ruling. This statute allows an award of attorneys' fees in actions to enforce obligations owed under "an evidence of indebtedness" that itself provides for the payment of attorneys' fees. *RC Associates v. Regency Ventures, Inc.*, 111 N.C. App. 367, 372, 432 S.E.2d 394, 397 (1993). It provides:

> Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness, in addition to the legal rate of interest or finance charges specified therein, shall be valid and enforceable, and collectible as part of such debt, if such note, contract or other evidence of indebtedness be collected by or through an attorney at law after maturity, subject to the following provisions:
>
> (1) If such note, conditional sale contract or other evidence of indebtedness provides for attorneys' fees *in some specific percentage* of the "outstanding balance" as herein defined, such provision and obligation *shall be valid and enforceable up to but not in excess of fifteen percent (15%)* of said "outstanding balance" owing on said note, contract or other evidence of indebtedness.
>
> (2) If such note, conditional sale contract or other evidence of indebtedness provides for the payment of reasonable attor-

neys' fees by the debtor, *without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%)* of the "outstanding balance" owing on said note, contract or other evidence of indebtedness.

N.C. Gen. Stat. § 6-21.2 (2001) (emphasis added).

The promissory note in this case stated that "[u]pon default . . . the Maker . . . agrees to pay to the holder reasonable attorney fees equal to fifteen percent (15%) of the outstanding balance due on the Note[.]" This clause "provides for attorneys' fees in some specific percentage of the 'outstanding debt,' " and thus subsection (1) applies. *Id.* Subsection (1) states that the provision in the note is "valid and enforceable up to but not in excess of fifteen percent." *Id.* Thus, it appears that defendants were entitled to 15% of the outstanding balance owing on the note by operation of the statute. We recognize that the mandatory notice requirement of N.C. Gen. Stat. § 6-21.2(5) was satisfied by the 11 October 1999 letter.

This Court is unaware of the reasoning behind the trial court denying this motion. Plaintiffs argue that the note did not reach maturity until the trial court announced the amount owed after making the adjustments in the judgment because the amount owed under the note was in dispute. *See Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.,* 143 N.C. App. 1, 545 S.E.2d 745, *aff'd per curiam,* 354 N.C. 565, 556 S.E.2d 293 (2001). According to plaintiffs, the outstanding balance, defined as "the principal and interest owing at the time suit is instituted," was unknown until such time. In fact, plaintiffs admit in their brief that when a final determination in this matter is reached, if defendants were to send a letter to them in the nature of their 11 October 1999 letter, defendants would be entitled to the $6,750.00 amount. But because plaintiffs filed this suit disputing the amount owed and not a suit by defendants after maturity, N.C. Gen. Stat. § 6-21.2 does not yet apply.

We disagree with plaintiffs' tortured application of the law to the present facts. There was no injunction relieving plaintiffs of the duty to pay under the note, and we have found no case or law stating that the filing of a suit for fraudulent acts relieves that obligation. Regardless of the fact that the amount owed under the note was disputed or why it was, on the face of the note, the amount was clear. By plaintiffs' filing their suit to avoid that obligation, defendants employed counsel to enforce the note. Plaintiffs defaulted by missing the 30 September 1999 payment, and the note allowed for accelera-

tion. At that point, the note had indeed matured. The outstanding balance was known at the time defendants filed their counterclaim. Nowhere in subsection (3) does it allow for post-trial adjustments. Thus, the trial court erred by denying defendants' motion.

This assignment of error is overruled.

We now consider the appeal by plaintiffs in this matter.

V.

[4] In plaintiffs' first assignment of error, they contend that the trial court erred in entering judgment both for possession of property and for money owed on the promissory note.

In the judgment, the trial court noted that:

At the hearing of this matter on August 31, 2001, defendant Bond Carpet & Floor Covering, Inc. requested judgment on its claim against plaintiff Kindred of North Carolina, Inc. for possession of the property described in the exhibit to the Security Agreement between said defendant and said plaintiff. Having heard and considered argument of counsel and the record, and having presided over the jury trial of this action, the court finds that the request should be denied *if* the judgment for money is paid within forty-five (45) days of the entry of this judgment; otherwise, defendant Bond Carpet & Floor Covering, Inc. should recover possession of property in accordance with the Security Agreement between said plaintiff and said defendant.

(Emphasis added.) In the decretal portion of the judgment, the trial court ordered that if the judgment was not satisfied in 45 days, then defendants would have judgment for possession on the property described in the security agreement, which was reproduced in the order. It concluded with "[a]ny property possession of which is obtained pursuant to this paragraph shall be sold as an execution sale in accordance with G.S. §§ 1-339.41-1-339.71."

Plaintiffs first contend that defendants failed to prove any right to possession of the collateral under the security agreement as no evidence was produced of perfection of the security interest by the filing of a financing statement or priority of competing interests, etc. However, issues of perfection and priority are irrelevant in disputes between the debtor and the secured party. *Mazda Motors v. Southwestern Motors*, 36 N.C. App. 1, 16-17, 243 S.E.2d 793, 804 (1978), *aff'd in part, rev'd in part on other grounds*, 296 N.C. 357,

250 S.E.2d 250 (1979). Evidence of perfection is simply irrelevant in the present case.

Plaintiffs continue that other than offering the security agreement into evidence, defendants did nothing else. It notes that according to Ms. Kindred's testimony, most of the property described in the security agreement had been donated to others or discarded, as the business had moved and no longer engaged in the exact same enterprise. Further, defendants did not prove that plaintiffs had any of the property in which they had a secured interest in their possession.

> If a debtor and a creditor enter into a security agreement granting to the creditor a security interest in certain collateral, and if value is given and the debtor has rights in the collateral, then the creditor becomes a secured party with a security interest which is enforceable against the debtor as to that collateral. *See* N.C. Gen. Stat. §§ 25-9-203(1)(a)-(c) (1988). Once the creditor has enforceable rights against the debtor as a secured party, it is said that the secured party's interest "attaches" to the collateral. *See* § 25-9-203(2).

*Zorba's Inn, Inc. v. Nationwide Mut. Fire Ins. Co.*, 93 N.C. App. 332, 334, 377 S.E.2d 797, 799 (1989).

Evidence at trial showed that the security agreement was signed and proper, value was given through the transaction, and debtor took possession of the collateral. Thus, a valid security interest was created and had attached to the collateral. *See current and former* N.C. Gen. Stat. § 25-9-203(1) (2001). The property was sufficiently described, as it only needed to be reasonably identified by the agreement. *See former* N.C. Gen. Stat. § 25-9-110 (1999) *and current* § 25-9-108 (2001).

Upon default of plaintiffs, defendants had several choices of remedies. Former N.C. Gen. Stat. § 25-9-501(1) and current § 25-9-601(a)(1) & (c) provide "that when a debtor is in default 'a secured party . . . may reduce his claim to judgment, foreclose or otherwise enforce the secured interest by any available judicial procedure. . . . The rights and remedies . . . are cumulative.' " *Ken-Mar Finance v. Harvey*, 90 N.C. App. 362, 367, 368 S.E.2d 646, 650, *disc. review denied*, 323 N.C. 365, 373 S.E.2d 545 (1988). Defendants had their choice of remedies and utilized many of those choices in their counterclaims, namely the money judgment and possession of the collateral. Instead of allowing defendants their choice of avenue of

satisfying the judgment, the trial court postponed the possession option by 45 days, and made it dependent upon full payment of the money judgment. Whether or not this was entirely proper on the part of the trial court, we fail to see how this prejudices plaintiffs. Certainly, a party with a security interest in collateral could get possession of such property if it elected to do so. The debtor in such a situation has no real choice in the matter. The trial court in the present case, by giving plaintiffs 45 days to satisfy the money judgment without having to give up collateral, has seemingly given plaintiffs a redemption period.

Further, the fears of a double recovery by awarding defendants the money judgment *and* possession are equally unfounded. Defendants are only entitled to the amount of the judgment. *See Ken-Mar*, 90 N.C. App. at 367, 368 S.E.2d at 650.

As we see no prejudice to plaintiffs, this assignment of error is overruled.

## VI.

Our upholding of the trial court's ruling on directed verdict of negligent misrepresentation and the jury verdict make our discussion of plaintiffs' final assignment of error unnecessary.

Affirmed in part; reversed in part as to attorneys' fees.

Judges McGEE and LEVINSON concur.