The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Taylor with minor modifications.
 *********** *Page 2 
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. There are no third-party defendants or cross-claimants.
3. Plaintiff was born December 9, 1944 and was 57 years of age in July 2002.
4. On or about July 17, 2002, plaintiff came to Raleigh to meet with a benefits counselor for defendant. Ms. Stallings met with Mr. Robert McKane, a benefits counselor employed by defendant.
5. Plaintiff thereafter submitted her application for retirement on July 22, 2002, showing an effective retirement date of August 1, 2002, which was received by the defendant on July 24, 2002.
6. In November 2002, plaintiff submitted her check in the amount of $39,528.29 (later plaintiff was refunded $2,410.89 because she had been overcharged) to defendant to purchase the thirteen years of withdrawn service.
7. In December, plaintiff received a communication dated December 10, 2002, from defendant informing her, for the first time, that her monthly benefit would be in the amount of $1,232.35, and not $1,675.13, as represented by defendant, through Mr. McKane.
8. The issues before the Commission are as follows:
A. Plaintiff's Issues
1. Was plaintiff damaged as a result of defendant's negligence? *Page 3 
2. What amount, if any, is plaintiff entitled to recover as a result of the negligence of defendant?
B. Defendant's Issues
 1. Did defendant's employee, Robert McKane, owe plaintiff a duty of care?
 2. If yes, did Robert McKane, breach that duty?
 3. If yes, did that breach proximately cause plaintiff injury?
 4. If yes, what, if any, damages is plaintiff entitled to?
 5. Was plaintiff contributorily negligent?
 6. If yes, did that negligence proximately cause plaintiff's injury?
 7. If yes, is plaintiff barred from recovery?
 8. Did plaintiff fail to mitigate her damages?
 9. If yes, to what degree should any judgment for plaintiff be offset?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born December 9, 1944, and was 57 years of age in July, 2002. Plaintiff grew up in Macclesfield, North Carolina and attended East Carolina University where she earned her degree in English in 1966. She also obtained her teaching certificate. Plaintiff returned to East Carolina University and earned a degree in counseling in 1976. Plaintiff was married and had two children, Candice Funderburk and James Stallings. Plaintiff and her husband divorced in 1987. *Page 4 
2. Plaintiff's career as a public school teacher/counselor started in 1966 and spanned 36 years until her retirement on August 1, 2002. In her earlier years, plaintiff was employed intermittently as she raised her children.
3. From 1984 through July, 2002, plaintiff was employed as a guidance counselor at several different schools.
4. During the Fall of 2001, plaintiff began seriously considering retirement. By the end of the year, plaintiff was 57 years of age, and served as a guidance counselor in an alternative school for at-risk children within the Rocky Mount/Nash County Schools.
5. During her years of service, plaintiff had been a participant in the North Carolina State Retirement System. She had accumulated credits for her years of service in latter years, but had withdrawn credits as she changed positions in previous years as a matter of financial necessity for home repair or the college education of her two children.
6. At the end of 2001, plaintiff received a statement reflecting that she had 6.4 years of credited service with the Retirement Systems Division.
7. During the Fall of 2001, plaintiff was informed by her principal that the State was permitting participants to "buy back" credit years which had been previously withdrawn at a discount rate. Plaintiff was aware at the time that she would have to buy back credits in order to retire. However, she had received documentation from the Retirement Systems Division during the previous year that she would have to pay $116,085.43 to buy back her withdrawn credits. Plaintiff could not afford that amount.
8. After she received the information regarding the "buy back" from her principal, plaintiff completed a state form Application to Purchase Service Credits and filed the application with the Retirement Systems Division on December 13, 2001. On her application, plaintiff *Page 5 
included the information requested concerning her past service with the North Carolina Public Schools.
9. Plaintiff was anxious to receive a response to her application to help her plan her retirement. Specifically, plaintiff needed information to determine whether she could buy back her credits; when she would be eligible to retire; and what her retirement benefits would be.
10. Plaintiff did not receive any response to her application. After several months she began calling the Retirement Systems Division. She called the agency repeatedly during various periods of time over the next six months. Whenever she called, she was put on hold or transferred to another party, but was never provided the information she requested.
11. During this time period, plaintiff was in close contact with her daughter, Candice Funderburk. Mrs. Funderburk and her husband, Douglas Funderburk, and their newborn child, lived in Winston-Salem, North Carolina. Plaintiff's son, James Stallings, also lived in Winston-Salem with his family. Mrs. Funderburk urged plaintiff repeatedly to continue calling the Retirement Systems Division to try to obtain information concerning her purchase of withdrawn benefits so that she could make plans for her retirement.
12. In early June 2002, plaintiff's school year ended with the Rocky Mount/Nash County Schools. Following the end of school, plaintiff went to Winston-Salem, North Carolina, to be with her daughter and son-in-law, the Funderburks, and their new child who had been born in January, 2002. Plaintiff planned to live with her daughter and son-in-law through the summer and to babysit for her new grandchild.
13. In June 2002, Mrs. Funderburk again urged plaintiff to call the Retirement Systems Division and to try to get the information which she had requested concerning the purchase of withdrawn credits. Plaintiff called repeatedly on the toll-free number that had been provided in *Page 6 
the Retirement Systems Division brochure. On each call, plaintiff was placed on hold for long periods of time, or transferred from employee to employee. Plaintiff never received the specific information she had requested in her application to purchase withdrawn credits.
14. During June-July, 2002, Mr. and Mrs. Funderburk also tried to obtain information on-line concerning plaintiff's retirement credits. However, while she was able to print out the Retirement Systems Division brochure, Mrs. Funderburk was unable to determine the purchase price for the withdrawn credits, and the number of years with which plaintiff would be credited following any purchase of her withdrawn credits.
15. Finally, plaintiff was advised to meet with a benefits counselor employed by the State.
16. On July 17, 2002, plaintiff and Ms. Funderburk traveled to Raleigh to meet with a benefits counselor in the Department of the State Treasurer, to review plaintiff's options for retirement. Plaintiff met with Mr. Robert M. McKane, a benefits counselor employed by the State.
17. Pursuant to the provisions of N.C. Gen. Stat. § 135-5(a), a member who is not a law-enforcement officer is eligible to retire upon reaching age 60 with at least 5 years of membership service, or at any age with 30 years of service. Additionally, pursuant to N.C. Gen. Stat. § 135-5(a1), a member may take "early" retirement at age 50 with at least 20 years of service.
18. A member who is not a law-enforcement officer is entitled to an "unreduced" retirement benefit if the member has at least 30 years of membership service; or is age 65 with at least 5 years of service; or is age 60 with at least 25 years of service. A 57-year-old member who is not a law-enforcement officer and who has 20 years of membership service is entitled to a *Page 7 
"reduced" retirement benefit, pursuant to the formula set forth in N.C. Gen. Stat. § 135-5(b19)(2). A law-enforcement officer, however, is entitled to an unreduced benefit at age 55 with at least 5 years of service. N.C. Gen. Stat. § 135-5(b19)(1).
19. Mrs. Funderburk, plaintiff's daughter, attended the meeting with plaintiff at her request. Mrs. Funderburk had business experience, and had assisted plaintiff in determining her financial needs for retirement, and accompanied plaintiff to insure that she obtained accurate and reliable information on which to make the important decisions which would determine her future.
20. Plaintiff and her daughter arrived at the office of the State Treasurer at approximately 8:55 a.m. on July 17, 2002. On the sign-in sheet, plaintiff stated in the space provided for "Purpose for Visit" the following: "To determine what options I have for retirement." After checking in, plaintiff and Mrs. Funderburk met with the State's counselor, Mr. McKane.
21. During the initial conversation, plaintiff and Mrs. Funderburk asked Mr. McKane to advise plaintiff concerning her retirement benefits and to prepare a statement of retirement benefits and a buy-back calculation given her years of service and years for repurchase, so that she could decide when she would be able to retire. Based on their discussion, Mr. McKane calculated plaintiff's benefits based on a retirement date of August 1, 2002. He first projected that her purchase of withdrawn credits would cost approximately $37,000.00.
22. Mr. McKane provided the information and his benefits calculations which appear on the document entitled "Preliminary Estimate of Retirement Benefits," reflecting monthly benefits to plaintiff of $1,675.13, and advised plaintiff that if she was satisfied with the calculated benefits she would receive, she should retire prior to the start of the school year on August 1, 2002. Plaintiff's daughter specifically asked Mr. McKane if there would be any margin of error *Page 8 
on his calculation and emphasized to Mr. McKane that plaintiff would be making critical decisions concerning her retirement based on his calculations. Mr. McKane stated that he understood that plaintiff was relying on his calculation, and represented that his calculations were accurate and reliable within a 3% margin of error. He indicated that the calculations he ran were run on the same program used by the State to generate benefits.
23. Plaintiff's conference with Mr. McKane ended at approximately 10:44 a.m. on July 17, 2002. At no time during their conversation did Mr. McKane indicate to plaintiff and her daughter that they should take any other action to confirm his figures. To the contrary, Mr. McKane acknowledged that he understood that plaintiff was relying on his calculations, and that she was seriously considering retiring from her position as a school counselor, effective August 2, 2002, based on his calculation of her benefits. Plaintiff reasonably relied on the information provided by the RSD benefits counselor. Only much later was it learned that the calculations of the benefits counselor and his written documentation were flawed — based on a critical error which resulted in a 26% reduction in plaintiff's monthly benefits for life. Nothing indicated to plaintiff that there was an error in the counselor's calculations or that she needed to question the information and documentation provided by the counselor. Nothing in the documentation or numbers raised a red flag even with the trained counselor that there was a flaw in his calculations during the almost two hours that he was conferring with plaintiff and her daughter. As it was learned much later, the form reflected that plaintiff's benefits were "unreduced." Plaintiff was not aware of the meaning of the term "unreduced." Indeed, the reason plaintiff sought a meeting with the counselor was that she knew she did not have the information or expertise to make the calculations herself. The term "unreduced" would have indicated to the counselor that he had a flaw in his calculations, but he failed to notice or detect it. *Page 9 
24. The State has no higher level of review for the calculation of benefits than Mr. McKane. There are no other counselors above Mr. McKane's level who can confirm his calculations to prospective retirees.
25. After the meeting and based upon the information obtained, plaintiff had her son and son-in-law help her calculate whether the "buy-back" was a good investment of funds and whether the benefits would cover her expenses.
26. Following her conference with Mr. McKane, plaintiff, in reliance on Mr. McKane's calculations that her buy back was $37,000.00 and benefits would be $1,675.13 per month, retired from her position as a counselor with the Nash-Rocky Mount School System. She filed her application on July 24, 2002, and was deemed retired effective August 1, 2002. Following her retirement, plaintiff waited for her retirement payments and instructions as to the buy-back of her creditable years of service. Plaintiff made contact with defendant on various dates between August and November, 2002, to inquire as to the status of her application.
27. At the time of her retirement, plaintiff was informed that she would receive confirmation of her benefits, confirmation of the purchase price for her buy back of credits, and notice that she was on retiree healthcare benefits within approximately 30 days.
28. By early October, 2002, plaintiff had received no information whatsoever. Because her employment healthcare benefits had been terminated, and her retiree benefits had not commenced, she was paying for needed medical care and prescriptions out of pocket.
29. In early October, 2002, plaintiff, once again, began calling employees of the Retirement System to determine the status of her retirement. She made a number of calls, some of which plaintiff noted in order to document her efforts, and still received no information. She finally called Mr. McKane, who had told plaintiff to call him if "something comes up." Mr. *Page 10 
McKane returned the call to Ms. Funderburk, but did not have any information as to the progress of plaintiff's retirement application.
30. Finally, in November, just before Thanksgiving, plaintiff received notice confirming her purchase price for her buy back of credits. While the document was dated October 16, 2002, plaintiff and the Funderburks established that she did not receive the document until just before Thanksgiving. The notice informed plaintiff that her purchase price for the buy back of her credits would be $39,528.29. The deadline for the payment of the buy back purchase amount was December 1, 2002, just days away. Plaintiff and her family worked quickly to arrange for the funding. The amount quoted was over $2,000 more than the amount represented by Mr. McKane. In fact, Mr. McKane's estimate of the buy back purchase amount was accurate. Over a month after plaintiff paid the buy back purchase amount, she received a statement that she had been overcharged, along with a refund of $2,410.89.
31. Plaintiff never received an explanation as to why she received the letter so late. Nevertheless, she sent to defendant a check in the amount of $39,528.29, in compliance with and in reliance on the instructions she received from defendant. Plaintiff, in reliance on the statements of Mr. McKane and the amounts provided by him regarding the cost of buying back her credits and the benefits she would receive, made irrevocable financial decisions. Plaintiff took $25,000.00 from her daughter and son-in-law to make the buy back. This money was provided from the Funderburks from their home equity and credit cards. Plaintiff took this money with the understanding that she would be caring for her very young grandchild.
32. In December, plaintiff received a communication from defendant dated December 10, 2002, four months after her retirement was effective, informing her for the first time that her monthly benefit would be in the amount of $1,232.35, and not $1,675.13, as represented by Mr. *Page 11 
McKane. This change represented a benefit 26.5% lower than the number plaintiff was given by Mr. McKane.
33. On January 3, 2003, plaintiff, with the assistance of Mrs. Funderburk, challenged the decision setting her monthly retirement benefits at the reduced amount, contending that she had relied on Mr. McKane's calculations in retiring on August 1, 2002. Between December 2002, and February, 2003, the Retirement Systems Division admitted to two other significant errors. On December 17, 2002, as noted above, the defendant acknowledged an overcharge for the buy back of plaintiff's credits in the amount of $2,410.89. Defendant refunded that amount. However, defendant refunded that amount on two separate occasions. On February 19, 2003, plaintiff sent a check to the Retirement System Division, representing a "refund for the double back pay" which she had inexplicably received.
34. Although it was determined that a keyboarding error by Mr. McKane and a default program in the computer that defaulted to law enforcement instead of a general state employee had resulted in a substantial error in the benefit amount given plaintiff, on March 7, 2003, the Retirement Systems Division entered its final agency decision denying plaintiff's claim for monthly retirement benefits in accordance with Mr. McKane's erroneous representations to her on July 17, 2002.
35. On July 17, 2002, when plaintiff traveled from Winston-Salem to Raleigh seeking the assistance of a trained retirement counselor, she did so in order to obtain specific relevant benefit amounts and "buy-back" information so that she would have reliable figures upon which to base her decision of whether to retire.
36. Plaintiff had not made the decision to retire prior to her July 17, 2002 meeting with Mr. McKane and receiving the benefit amount he gave her. *Page 12 
37. Plaintiff reasonably relied upon Mr. McKane's representations regarding the amount of her monthly benefits.
38. Plaintiff would not have retired from her employment if she had been informed that her monthly benefit would be $1,232.35.
39. At the time of her retirement, plaintiff was earning a salary of $60,700 per year, or $5,058 per month on a 12 month calendar.
40. Following the final denial of the Retirement Systems Division, plaintiff was not in a position to reverse her decision to retire based upon financial gifts from her children to buy back her credit years and her assumption of the care of her grandchild, which was based upon reliance on Mr. McKane's representation.
41. Following plaintiff's detrimental reliance and resulting retirement, for the first time, plaintiff was informed in December 2002 that her benefits had been reduced by approximately 26% on a monthly basis for life, and that the counselor's original calculations, on which she had made her decision, were flawed. Because of inordinate delays in its processing of plaintiff's retirement documentation, defendant did not notify plaintiff of its error until after plaintiff had retired from her long-time position of employment with the Rocky Mount/Nash County Schools, had lost her healthcare and other benefits which she had during her employment, had paid to defendant with borrowed funds over $39,000 for the buy back of her credits, and had committed herself wholeheartedly to her family to care for her grandchild and to permit her daughter and son-in-law to advance in their careers. This was a decision and commitment which had been made as a proximate result of the counselor's misrepresentations of her benefits.
42. Initially defendant's reaction was to admit its error, to acknowledge the seriousness of its error, and to encourage plaintiff and her daughter to appeal the reduction in *Page 13 
benefits. Significantly, at no time did defendant indicate or advise plaintiff that she should cancel or rescind her retirement. Subsequently, defendant's reaction was to deny any responsibility for this error that lead to plaintiff's retirement and other decisions. Ultimately, defendant has attempted to shift the focus from its own admitted error, a serious mistake of fact that induced plaintiff to make life decisions, to aggressively scrutinizing plaintiff's retirement decision. Defendant asserts plaintiff was negligent for listening to its counselor, relying on Mr. McKane's advice and information, failing to question or doubt Mr. McKane's representations, and failing to note or understand the significance of the term "unreduced" appearing in the fine print of defendant's form which its counselor did not note, and which had no meaning to plaintiff.
43. There is a pattern and practice presented in this case of errors and omissions by defendant which adversely affected plaintiff.
44. Plaintiff has been damaged by the negligence of defendant in the amount of $91,500.00 as of August 31, 2006. Plaintiff's damages are based on the difference in value of the erroneous benefit quoted by defendant's agent and the actual benefit plaintiff received from plaintiff's retirement date through plaintiff's life expectancy reduced to the present value.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Defendant's employee, Robert M. McKane, acting within the course and scope of his duties as a benefits counselor with the North Carolina Retirement Systems Division, owed a duty to plaintiff to provide accurate factual information in response to plaintiff's request concerning her retirement benefits. N.C. Gen. Stat. § 143-291. *Page 14 
2. Mr. McKane breached his duty of care to plaintiff when he failed to use reasonable care and erroneously calculated her benefits and mistakenly misrepresented to her that her monthly retirement benefits would total within three percent of $1,675.12 for life if she were to retire effective August 1, 2002. Kindred of N.C. v. Bond, 160 N.C. 90,584 S.E.2d 846 (2003).
3. While plaintiff had a duty to review the calculations for obvious errors in the information provided by Mr. McKane regarding issues, such as the number of years of her service, it would be unreasonable to expect plaintiff to understand the term of art "unreduced" and its ramifications as it related to her retirement benefits. Plaintiff had a right to rely and, in fact, did rely on counselor McKane's knowledge of how to calculate benefits under the retirement system, including determining whether a particular employee is entitled to "reduced" or "unreduced" benefits. The word "unreduced" had no meaning to plaintiff, nor would a reasonable person attach any meaning to the word. In addition, the term "unreduced" on the estimate of retirement benefits provided to plaintiff by counselor McKane was in such small font at the bottom of a full page of typed information, that a reasonable person would not have seen or attached any significance to the term "unreduced." Thus, plaintiff reasonably relied on retirement counselor McKane's calculation that her monthly benefits would total $1,675.12. Id.
4. As a proximate result of Mr. McKane's negligent misrepresentations, plaintiff retired from her employment with the Rocky Mount/Nash County Schools effective August 1, 2002. It was reasonably foreseeable that plaintiff was going to make her decision regarding her retirement based upon defendant's representations. Plaintiff has been damaged in her reasonable reliance on Ms. McKane's negligent misrepresentations in the amount of $91,500.00 as of August 31, 2006. Id.
5. Plaintiff was not contributorily negligent. *Page 15 
6. Plaintiff did not fail to mitigate her damages.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
It is hereby ORDERED that defendant shall pay plaintiff $91,500.00 in damages.
This the 11th day of June, 2009.
S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER