Value Health Sols. Inc. v. Pharm. Research Assocs., Inc., 2019 NCBC 68.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

VALUE HEALTH SOLUTIONS
INC. and NAGARAJAN
PARTHASARATHY,

          Plaintiffs,

   v.

PHARMACEUTICAL
RESEARCH ASSOCIATES, INC.
and PRA HEALTH SCIENCES,
INC.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CV-12318

**ORDER AND OPINION ON
PLAINTIFFS' MOTION TO DISMISS
DEFENDANTS' AMENDED
COUNTERCLAIMS**

THIS MATTER comes before the Court on Plaintiffs Value Health Solutions, Inc. ("Value Health") and Nagarajan Parthasarathy's ("Parthasarathy"; collectively "Plaintiffs") Motion to Dismiss Amended Counterclaims. ("Motion", ECF No. 41.) The Court, having considered the Motion, the briefs submitted in support of and in opposition to the Motion, and the arguments of counsel at the hearing on the Motion, concludes that the Motion should be GRANTED, in part, and DENIED, in part for the reasons set forth below.

> *Mainsail Lawyers by David Glen Guidry and Joseph Kellam Warren for Plaintiffs Value Health Solutions, Inc. and Nagarajan Parthasarathy.*
>
> *Kilpatrick Townsend & Stockton LLP by Randy Avram, John Moye, and Joe P. Reynolds for Defendants Pharmaceutical Research Associates, Inc. and PRA Health Sciences, Inc.*

McGuire, Judge.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

1.      The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts included in the complaint that are relevant to the Court's determination of the Motion.  *See e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).  The facts relevant to the determination of the Motion are drawn from Defendants' Amended Counterclaims.  ("Amended Counterclaims", ECF No. 37 at CC.)[1]

2.      Defendants Pharmaceutical Research Associates, Inc. ("PRA, Inc.") and PRA Health Sciences ("PRA Health") comprise "one of the world's leading global contract research organizations (CRO), engaging in the design, implementation, and management of clinical trials all over the world."  (ECF No. 37 at CC, ¶¶ 1, 11.) (Collectively, Defendants will be referred to herein as "PRA," in the singular, except as otherwise required.)   PRA conducts clinical trials for pharmaceutical and biotech companies.  As of December 20, 2018, PRA employed 15,000 employees in 60 different countries.  (*Id.* at ¶ 11.)

3.      Plaintiffs are the developers of clinical trial management software ("CTMS"), a type of software CRO's use to manage clinical trials.  Plaintiffs developed a software product, called the "Solution," which they represented to PRA as being suitable for use by large CRO's for conducting global clinical trials.  (*Id.* at ¶¶ 13–14.) Parthasarathy was employed by Value Health as its president.

---

[1] Defendants' Amended Counterclaims are contained within ECF No. 37, which is entitled Defendants' Amended Answer, Affirmative Defenses, and Counterclaims.  The Amended Counterclaims are set out under a separate heading and contain 99 numbered paragraphs.  The Court herein cites to the Counterclaims as (ECF No. 37 at CC.)

*A. Negotiation and Sale of Plaintiffs' Solution to PRA and Alleged Misrepresentations by Plaintiffs*

4.      From early 2014 through May 2015, Plaintiffs and PRA engaged in negotiations for PRA's acquisition of the Solution. (*Id.* at ¶¶ 1, 11–20.) During the negotiations, PRA alleges that Plaintiffs "represented themselves to PRA as sophisticated software developers with expertise in," CTMS and with "expertise [in] implementation of CTMS on a global-scale." (*Id.* at ¶ 13 (quotation marks omitted).) Parthasarathy represented that the Solution "was capable, over the next five years, of simultaneously addressing the specific needs of up to 20 'Big Pharma' customers, . . . 80 'Big Biotech' customers, . . . and 100 'Small Pharma' customers[.]" (*Id.* at ¶ 15.) "Parthasarathy knew the details of the clinical trial management system ("CTMS") then in use by PRA and the requirements that PRA had for any CTMS it deployed in the future, including the requirement that the CTMS be capable of handling global, sophisticated clinical trials." (*Id.* at ¶ 16.)

5.      Additionally, after allegedly conducting a functionality comparison between the Solution and the clinical trial management system then used by PRA, Parthasarathy "represented that . . . the Solution had higher 'functionality' with respect to (1) 'user interface, . . . (2) upgradability, . . . and (3) externalization[.]'" (*Id.* at ¶ 16.) Plaintiffs even advised PRA that "the Solution would be an improvement over the clinical trial management system PRA had in place . . . and that implementing it would save PRA money." (*Id.* at ¶ 25.) Lastly, Parthasarathy claimed that if it acquired the Solution PRA could expect to generate around $250

million in revenue over five years from licensing the Solution to third parties. (*Id.* at ¶ 15.)

6.  Plaintiffs also made certain representations to PRA regarding Plaintiffs' ability to enhance the functionality of the Solution to ensure that it met PRA's needs. On June 2, 2014, PRA's Executive Director of IT provided Parthasarathy with a summary of key product enhancements "the Product Enhancements") that were needed to "close the gap" between the Solution and the clinical trial management system then used by PRA. (*Id.* at ¶ 17.) In response, on November 20, 2014, Parthasarathy communicated to PRA that Plaintiffs had implemented a majority of the Product Enhancements and that seven of the Product Enhancements were "ready and tested," including: "PDF templates;" "Confirmation/Follow-Up Letters;" "Interim Payments (Advances) calculations;" "Milestone Payments;" "Budget Templates & Items;" and "Enable export to XLS/CSV from Views." (*Id.* at ¶ 18.) PRA alleges "upon information and belief" Plaintiffs had not implemented the seven Product Enhancements and "Parthasarathy knew these enhancements had not been implemented into the Solution and were not 'ready and tested.'" (*Id.* at ¶ 19.)[2]

7.  On May 21, 2019, PRA and Plaintiffs entered into an Asset Purchase Agreement (the "APA", ECF No. 8.1 at APA), which contained the terms for Plaintiffs'

---

[2] PRA subsequently alleges that "Parthasarathy represented to PRA on November 20, 2014 that *ten* of the twenty [Product Enhancements] had already been implemented into the Solution." (ECF No. 37 at CC, ¶ 26.) For purposes of deciding the Motion, the Court will rely on the allegation that Parthasarathy represented that ten Product Enhancements had been implemented as of the time of the execution of the APA.

sale of the Solution to PRA.[3]  (ECF No. 37 at CC, ¶ 20.)  PRA alleges it relied on Plaintiffs' representations, and particularly on Parthasarathy's representation that ten of the Product Enhancements had been implemented into the Solution and were "ready and tested" in deciding to enter into the APA.  (*Id.* at ¶ 20.)

8.     Pursuant to the APA, PRA paid Plaintiffs $2,457,000 in stock and cash for the Solution.  (ECF No. 8.1 at APA, p. 3.)  The APA also provided for additional contingent payments to be made by PRA to Plaintiffs if certain milestones set forth in the APA were met.  (*Id.* at pp. 3–4.)  A separate document entitled Schedules to the Asset Purchase Agreement, referenced in the APA, details the requirements Plaintiffs were expected to satisfy to achieve the milestones in the APA.  ("Schedules", ECF No. 8.1 at Schedules.)  Three of the milestones set were contingent upon Plaintiffs (1) integrating the Solution with PRA's existing clinical trial management software ("First Milestone"); (2)  completing key product enhancements to the Solution ("Second Milestone"); and (3) migrating PRA's former clinical trial management studies into the Solution ("Third Milestone", collectively "Milestones"), all within eighteen months from the closing date of the sale.  (ECF No. 8.1 at APA, pp. 3–4; ECF No. 8.1 at Schedules, pp. 4–7; ECF No. 37 at CC, ¶¶ 21–24.)  The closing date of the APA was June 8, 2015 ("the Closing").  (ECF No. 37 at CC, ¶ 31.)

---

[3] The Asset Purchase Agreement ("APA") was filed as an attachment to Defendants' original Answer and can be found at electronic docket entry 8.1.  The APA includes an attachment entitled Schedules to the Asset Purchase Agreement ("Schedules"), which is referred to by and incorporated into the APA.  For ease of reference, the Court will cite to the APA as (ECF No. 8.1 at APA) and will cite to the Schedules to the APA as (ECF No. 8.1 at Schedules)

9.     PRA claims Plaintiffs made multiple representations prior to entering into the APA that led PRA to believe Plaintiffs could achieve the above Milestones within eighteen months after the Closing.  Plaintiffs claimed that the Solution "would allow PRA to build, within eighteen months of the closing date, a new platform that would have functionality equivalent to—if not better than—PRA's prior clinical trial management system." (ECF No. 37 at CC, ¶ 25.)  Plaintiffs further stated that the Solution was 90% ready and that it would not be difficult to integrate and incorporate some of the functions PRA needed in its trial management system within eighteen months of the Closing.  (*Id.* at ¶ 26.)  Parthasarathy also represented that ten of the twenty Product Enhancements needed to achieve the Second Milestone in the APA "had already been implemented into the Solution."  (*Id.* at ¶ 26.)

10.     According to PRA, however, many of the representations made by Plaintiffs prior to entering into the APA were either knowingly false or made negligently.  PRA alleges that "at the time [Plaintiffs] entered into the APA, and made the representations identified above, [Plaintiffs] knew, or should have known, that the Solution would not be capable of achieving the functionality set forth in the Milestones within eighteen months of the closing date of the sale." (*Id.* at ¶ 28.)  PRA further alleges that Plaintiffs "failed to inform PRA that the Solution was suitable only for small-scale clinical trials; that it lacked the stated and identified functionality; and thus that it was plainly incapable of being used in the types of global clinical trials PRA is engaged to perform." (*Id.* at ¶ 30.)  Lastly, PRA claims that Parthasarathy knew that the enhancements to the Solution requested by PRA

had not been implemented into the Solution and were not "ready and tested." (*Id.* at ¶ 19.)

B. *Parthasarathy's Employment with PRA, Inc. and Alleged Breaches of Employment Agreement and Settlement Agreement*

11.   On June 8, 2015, Parthasarathy and PRA, Inc. entered into an Employment Agreement. ("Employment Agreement", ECF No. 8.3.)  Pursuant to the Employment Agreement, Parthasarathy was employed as Vice President of PRA, Inc. (ECF No. 37 at CC, ¶¶ 32–33; ECF No. 8.3, at p. 1.)  Among other things, the Employment Agreement required Parthasarathy to "use [his] best efforts in support of the Company's business and [ ] devote [his] full time, skill, attention, and energies to the Company's business."  (ECF No. 37 at CC, ¶ 33; ECF No. 8.3, at p. 1.)  The Employment Agreement also prohibited Parthasarathy from "engag[ing] in any other business activity which is competitive with the Company's business or which may (i) interfere with [his] ability to discharge [his] responsibilities" and from "work[ing] on either a part-time or independent contracting basis for any other company, business, or enterprise without the prior written consent of [PRA, Inc.'s] CEO."  (ECF No. 37 at CC, ¶ 33; ECF No. 8.3, at p. 1.)

12.   Parthasarathy ended his employment with PRA, Inc. effective December 29, 2017.  On February 9, 2018, Parthasarathy and PRA, Inc. entered into a Confidential Release and Settlement Agreement ("Settlement Agreement").  According to PRA, in the Settlement Agreement, Parthasarathy represented that he had "not breached any provision of the [ ] Employment Agreement."  (ECF No. 37 at CC, ¶ 42.)

13. After ending his employment with PRA, Inc., Parthasarathy was appointed as President and CEO of a company called My Games Solution, Inc. ("My Games"). (*Id.* at ¶ 43.) Upon information and belief, PRA alleges that in or around June 2017, My Games released "a mobile application called 'Sports Made Easy' which focuses on connecting tennis players with each other." (*Id.*) Upon further information and belief, PRA alleges that Parthasarathy was the primary developer of Sports Made Easy, developed Sports Made Easy while still employed by PRA, Inc., and created Sports Made Easy using the systems, materials, equipment, and/or other resources of PRA. (*Id.* at ¶¶ 43–44.) Lastly, Plaintiffs allege, upon information and belief, that Parthasarathy's efforts to design and create Sports Made Easy while employed by PRA interfered with [his] ability to discharge his responsibilities to PRA, as required by his employment agreement. (*Id.* at ¶ 45.)

*C. Parthasarathy's Alleged Tortious Interference*

14. Chuck Piccirillo ("Piccirillo") served as Senior Vice President of PRA, Inc. from 2013 to 2016. Piccirillo had a written employment agreement with PRA, Inc. ("Piccirillo Employment Agreement") in which he recognized that certain information and knowledge he gained as an employee of PRA, Inc. was confidential, and agreed not to disclose such confidential information to "any person . . . or otherwise use or disclose it or allow it to be used or disclosed for any purpose, other than as may be permitted [by the Piccirillo Employment Agreement]." (*Id.* at ¶ 49; Piccirillo Employment Agreement, ECF No. 8.2.)

15. While employed by PRA, Inc., Piccirillo played a lead role on behalf of PRA in analyzing the Solution for PRA and negotiating with Plaintiffs prior to the execution of the APA. (ECF No. 37 at CC, ¶ 51.) PRA alleges that because of his previous role with PRA, Inc. Piccirillo is in possession of PRA's privileged and confidential information. (*Id*. at ¶ 52.)

16. Piccirillo is now employed by My Games as Chief Technology Officer. (*Id*. at ¶ 51.) Upon information and belief, PRA alleges that Parthasarathy "knows the Piccirillo Employment Agreement" prohibits Piccirillo from disclosing PRA's confidential information, but nevertheless "induced Piccirillo to breach [the Piccirillo Employment Agreement] and divulge privileged and confidential information about PRA's intentions with respect to the APA, in order to aid [Plaintiffs] in their current lawsuit." (*Id*. at ¶¶ 53–54.) As an example, PRA claims that Plaintiffs' allegations in the Complaint in this lawsuit concerning PRA's alleged misrepresentations of its "intentions" concerning the Solution "are based upon Piccirillo's disclosure of (and mischaracterization of) confidential and privileged PRA information." (*Id*. at ¶ 54.) Based upon these allegations, PRA brings a claim against Parthasarathy for tortious interference with contractual relations.

*D. Procedural History*

17. Plaintiffs filed the Complaint in this matter on October 5, 2018. (ECF No. 5.) On January 18, 2019, PRA filed its original Answer, Affirmative Defenses, and Counterclaims. (ECF No. 8.) On March 26, 2019, PRA filed the Amended Counterclaims in which PRA brings the following counterclaims: (1) breach of

contract against Parthasarathy and Value Health; (2) fraudulent inducement against Parthasarathy and Value Health; (3) negligent misrepresentation against Parthasarathy and Value Health; (4) breach of contract against Parthasarathy; and (5) tortious interference with contractual relations against Parthasarathy.

18. On April 25, 2019, Plaintiffs filed the Motion, and a supporting brief (Supp. Br., ECF No. 42), seeking the dismissal of Defendants' counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. On May 15, 2019, Defendants filed a response brief in opposition to the Motion (Opp. Br., ECF No. 47), and on May 28, 2019, Plaintiffs filed their reply brief (Reply Br., ECF No. 48).

19. The Court requested supplemental briefs from the parties regarding which states' laws should apply to Counts I–III. On June 12, 2019, Plaintiffs and PRA filed supplemental briefs addressing this question. (PRA's Br., ECF No. 55; Pls.' Br., ECF No. 56.)

20. On June 27, 2019, the Court held a hearing on the Motion, which now is ripe for resolution.

## II.     LEGAL STANDARD

21. Dismissal of a counterclaim pursuant to Rule 12(b)(6) is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018). The Court, in deciding a Rule 12(b)(6) motion, construes the claims liberally,

accepting all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The facts and permissible inferences set forth in the claims are to be treated in a light most favorable to the nonmoving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

22. In deciding a motion to dismiss under Rule 12, the Court also may consider documents which are the subject of plaintiff's complaint and to which the complaint specifically refers, including the contract that forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). A "trial court can reject allegations [in the pleadings] that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the [C]omplaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862.

### III.   ANALYSIS

23. Defendants bring five counterclaims: (1) breach of the APA, (2) fraud in the inducement, (3) negligent misrepresentation, (4) breach of the Employment Agreement, and (5) tortious interference with contract. (ECF No. 37 at CC, ¶¶ 56–99.) The Court will address each claim in turn.

*A. Count I: Breach of Contract (APA)*

24. PRA alleges Plaintiffs breached section 3.22 of the APA. Section 3.22 provides as follows:

> No representation or warranty by Seller in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Purchaser pursuant to this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

(ECF No. 8.1 at APA, Art. 3, § 3.22.)

25. PRA alleges that Plaintiffs violated section 3.22 by "failing to correct" the alleged misrepresentations made to PRA during negotiation of the APA regarding the implementation of certain Product Enhancements, the suitability of the Solution for large scale clinical trials, and the potential for achieving full functionality of the Solution within eighteen months following the Closing. (ECF No. 37 at CC, ¶¶ 56–64.) PRA contends that the failure to correct the misrepresentations were "omissions" that "made statements contained in the APA false." (*Id.* at ¶¶ 60–63.)

26. As a preliminary matter, the Court must determine what jurisdiction's law applies to the claim for breach of the APA. The APA provides that "[t]his Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without giving effect to the principles of conflicts of laws thereof." (ECF No. 8.1 at APA, p. 22.) Based on this language, PRA contends that Delaware law should be applied to the claim for breach of the APA. (ECF No. 55, at pp. 2–3.) Plaintiffs argue that the breach of APA claim is "actually a fraud claim in disguise," and not a breach of contract claim, and that North Carolina law should apply under principles of *lex loci*. (ECF No. 56, at pp. 3–4.)

27.     "As a general rule, North Carolina will give effect to a contractual provision agreeing to a different jurisdiction's substantive law." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980) ("[W]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect."); *Akzo Nobel Coatings Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *21 (N.C. Super. Ct. Nov. 3, 2011). However, North Carolina courts will not apply the chosen state's law if "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of [North Carolina]." *Cable Tel Servs. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 643, 574 S.E.2d 31, 33–34 (2002) (applying North Carolina law to a contract dispute despite a Colorado choice of law provision because there was no substantial relationship between the parties or transaction to Colorado).

28.     The Court concludes that Delaware law should be applied to the Count I for breach of the APA. First, PRA is a Delaware corporation. (ECF No. 37 at CC, ¶ 6; ECF No. 8.1 at APA, p. 1.) Second, Plaintiffs do not argue that that there is not a substantial relationship between Delaware law and the parties or the transaction, nor that applying Delaware law to the claim for breach of the APA would be contrary to a policy of North Carolina.

29.     "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a

resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del. Ch. 2003); *Scott v. Lackey*, 2012 NCBC LEXIS 60, at *36 (N.C. Super. Ct. Dec. 3, 2012).

30.   "Under Delaware law, the interpretation of contract language is treated as a question of law." *L&L Broad. LLC v. Triad Broad. Co.*, 2014 Del. Super. LEXIS 212, at *8 (Del. Super. Ct. Apr. 8, 2014) (citing *Playtex FP, Inc.v. Columbia Cas. Co.*, 622 A.2d 1074, 1076 (Del. Super. 1992).) *See also, AT&T Corp. v. Lillis*, 953 A.2d 241, 251–52, 2008 Del. LEXIS 242, at *24 (Del. Mar. 12, 2008) ("Because this 'involve[s] the interpretation of contract language, [it is a] question of law that this Court reviews *de novo* for legal error."'). "Contract interpretation is governed by the parol evidence rule." *L&L Broad. LLC*, 2014 Del. Super. LEXIS 212, at *8.

> The parol evidence rule provides that '[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as to the complete and accurate integration of that contract, evidence . . . of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.' To ensure compliance with the parol evidence rule, the Court first must determine whether the terms of the contract it has been asked to construe clearly state the parties' agreement. In this regard, the Court must be mindful that the contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms. 'Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.' Upon concluding that the contract clearly and unambiguously reflects the parties' intent, the Court's interpretation of the contract must be confined to the document's 'four corners.' The Court will interpret the contract's terms according to the meaning that would be ascribed to them by a reasonable third party.

*L&L Broad. LLC v. Triad Broad. Co.*, 2014 Del. Super. LEXIS 212, at *8–9 (Del. Super. Ct. Apr. 8, 2014) (quoting *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 546–47 (Del. Super. 2005) *aff'd*, 886 A.2d 1278 (Del. 2005) (internal citations omitted)). *See also, Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 145, 2009 Del. LEXIS 234, at *12 (Del. May 20, 2009) ("In analyzing disputes over the language of a contract, we give priority to the intention of the parties. We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." (citation and quotations omitted)).

31. Section 3.22 of the APA is clear and unambiguous and would be breached only if Plaintiffs made an untrue, material statement in the APA or omitted to provide PRA material information that made a statement expressly contained in the APA misleading.

32. The APA does not contain a representation that any of the twenty Product Enhancements had been implemented or were ready and tested at the time the parties executed the APA. To the contrary, Schedule 2.6(a)(ii) lists all 20 of the discreet Product Enhancements as tasks to be accomplished under the APA and does not differentiate or identify any Product Enhancements as having been implemented already. Since there is no express language in the APA that any of the Product Enhancements were already implemented, Plaintiffs' failure to correct their pre-contract claim that 10 Product Enhancements already were implemented is not an

omission of "a material fact necessary to make the statements contained [in the APA and Schedules], in light of the circumstances in which they are made, not misleading." (ECF No. 8.1 at APA, § 3.22.)

33. Similarly, the APA does not contain any promise or guarantee by Plaintiffs that the Milestones would be achieved within eighteen months of the Closing, but instead provides only that PRA was eligible for Incentive Payments if certain steps in the implementation of the Solution were completed within eighteen months after the Closing . Again, since there is no language in the APA promising or guaranteeing that Plaintiffs would complete the Milestones within eighteen months after the Closing, Plaintiffs' failure to correct any representation that the Milestones would be completed in eighteen months or less is not an omission of "a material fact necessary to make the statements contained [in the APA and Schedules], in light of the circumstances in which they are made, not misleading." (*Id*.) There is no misleading statement in the APA regarding completion of the Milestones.

34. PRA has not sufficiently alleged a breach of section 3.22 of the APA. Therefore, Plaintiffs' motion to dismiss PRA's first counterclaim for breach of the APA should be GRANTED, and the claim DISMISSED.

*B. Counts II and III: Fraud in the Inducement and Negligent Misrepresentation*

35. As a preliminary matter, the parties contend, and the Court agrees, that North Carolina law applies to the claims for fraudulent inducement and negligent representation. (ECF No. 55, at pp. 3–6; ECF No. 56, at pp. 5–6.) In North Carolina, "[f]or actions sounding in tort, the state where the injury occurred is considered the

situs of the claim," or the *lex loci delicti. Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722 (2010) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988)). "The place of the injury is the state where the injury or harm was sustained or suffered—the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, and the substantive law of that state applies." *Camacho v. McCallum*, 2016 NCBC LEXIS 81, at *17 (N.C. Super. Ct. Oct. 25, 2016) Plaintiffs contend that any injury to PRA occurred in North Carolina. (ECF No. 56, at p. 6.) PRA argues that all of the conduct giving rise to its injuries took place in North Carolina. (ECF No. 55, at p. 4.) The Court concludes that North Carolina law should be applied to the counterclaims for fraudulent inducement and negligent misrepresentation.

36. PRA brings counterclaims for fraud in the inducement and negligent misrepresentation based on Plaintiffs' alleged misrepresentation. (ECF No. 37 at CC, ¶¶ 65–83.)

> While fraud has no all-embracing definition and is better left undefined lest crafty men find a way of committing fraud which avoids the definition, the following essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.

*Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); *see also Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568–69, 374 S.E.2d 385,

391 (1988) (quoting *Ragsdale* and holding that it "correctly defines the elements of fraud"); *State Props. v. Ray*, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002); *Ward v. Fogel*, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014) ("The essential elements of fraud [in the inducement] are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.").

37.     "Furthermore, any reliance on alleged false representations must be reasonable.  Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence but failed to investigate." *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277, 715 S.E.2d 541, 549-550 (2011) (citing *State Props*, 155 N.C. App. at 72, 574 S.E.2d at 186) (internal citations omitted).

> [N]egligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.  Reliance is not justifiable for purposes of negligent misrepresentation if a plaintiff failed to make reasonable inquiry, had the opportunity to investigate, and could have learned the true facts through reasonable diligence[.]

*BDM Invs. v. Lenhil, Inc.*, 2019 N.C. App. LEXIS 278, *27–28, 826 S.E.2d 746 (2019) (citing and quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) and *Roundtree v. Chowan County*, 252 N.C. App. 155, 162, 796 S.E.2d 827, 832 (2017)) (internal quotation marks and citations omitted).

38.     PRA alleges it relied on Plaintiffs' pre-contractual misrepresentations in deciding to enter the APA. (ECF No. 37 at CC, ¶¶ 13–29.)  In support of its

counterclaims for fraud in the inducement and negligent misrepresentation, PRA alleges that:

 a. During the negotiations prior to entering into the APA, Plaintiffs represented to PRA that Plaintiffs had already implemented ten of the twenty Product Enhancements identified on Schedule 2.6(a)(ii) into the Solution, seven of which were "ready and tested." (ECF No. 37 at CC, ¶¶ 66 and 77). PRA also alleges that Plaintiffs "failed to correct Parthasarathy's false representation" before the parties executed the APA. (*Id*. at ¶ 69);

 b. During negotiations prior to entering into the APA, Plaintiffs represented to PRA that "the Solution would be capable of achieving the functionality set forth in the Milestones within eighteen months of the Closing Date." (*Id*. at ¶¶ 68 and 78.) PRA also alleges that Plaintiffs "failed to inform PRA that the Solution would be incapable of achieving the functionality set forth in the Milestones within eighteen months of the Closing Date." (*Id*. at ¶ 70);

 c. During negotiations prior to entering into the APA, Plaintiffs represented to PRA that the Solution would allow PRA to build, well within eighteen months of the Closing Date, a 'new platform' that would have functionality equivalent to PRA's prior clinical trial management system." (*Id*. at ¶¶ 67 and 78).

39. Plaintiffs move to dismiss the claims for fraudulent inducement and negligent misrepresentation, contending that (a) the claims are precluded by the merger clause in the APA, and (b) the allegations fail to allege the misrepresentations with sufficient particularity as required by Rule 9(b). (ECF No. 42, at pp. 14–16.) Plaintiffs also contend that the claim for negligent misrepresentation fails because PRA has not pleaded the necessary elements to sustain such a claim. (*Id.* at pp. 16–18.) The Court first addresses the argument that the merger clause precludes the claims.

40. The APA contains a provision entitled "Entire Agreement" which states "[t]his Agreement, including the Schedules and Exhibits hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions, negotiations, and understandings." (ECF No. 8.1 at APA, p. 23.) Plaintiffs argue that this provision is a "merger clause" that precludes PRA from making claims based on representations Plaintiffs made during negotiations for the APA. (ECF No. 42, at pp. 10–11, 14–15.) PRA argues that its claims for fraud and negligent misrepresentation are not precluded in this case because it has alleged that Plaintiffs fraudulently induced PRA into executing the APA. (ECF No. 47, at pp. 17–18, 19.) The Court agrees.

41. The Court has concluded that Delaware law applies to the interpretation of the language of the contract at issue here. Under Delaware law, generally "a merger clause does not preclude a claim based upon fraudulent misrepresentations." *Norton v. Poplos*, 443 A.2d 1, 6, 1982 Del. LEXIS 354, at *15 (Del. Mar. 11, 1982)

(citing *Slater v. Berlin*, D.C. Mun. Ct. App., 94 A.2d 38, 43 (1953); *Ortel v. Upper Ashburton Realty Co.*, Md.Ct.App., 171 Md. 678, 190 A. 239, 242 (1937)). Delaware recognizes a narrow exception to this general rule when

> the contract's terms, when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent. Because Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract. . ..
>
> Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims. Rather, in that circumstance, the defendant will remain at risk if the plaintiff can meet the difficult burden of demonstrating fraud.

*Kronenberg v. Katz*, 872 A.2d 568, 593, 2004 Del. Ch. LEXIS 77, *61–63 (May 19, 2004) (emphasis added).

42. The merger clause in the APA is virtually identical to the standard integration clause contained in the agreement in *Kronenberg* that the court held

insufficient to bar a fraud claim.[4]  *Id.,* 872 A.2d at 587–94, 2004 Del. Ch. LEXIS 77, at \*45–64.  Like the merger clause in *Kronenberg*, the "entire agreement" provision in the APA lacks specific, express anti-reliance language stating that PRA did not rely on the alleged statements preceding the execution of the APA upon which they now base their claims for fraudulent inducement and negligent misrepresentation. Accordingly, under Delaware law the Court must conclude that the merger clause in the APA cannot be interpreted as an anti-reliance provision precluding PRA's claims for fraudulent inducement and negligent misrepresentation based on statements made prior to the execution of the APA.  Plaintiffs' argument that the merger clause bars the claims for fraudulent inducement and negligent misrepresentation fails.

43.  Plaintiffs also argue that PRA's fraud allegations are not sufficiently particular to satisfy Rule 9(b).  (ECF No. 42, at pp. 15–16.)  Rule 9 of the North Carolina Rules of Civil Procedure requires that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  N.C.G.S. § 1A-1, Rule 9(b).  "In pleading actual fraud, the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations."  *Terry v. Terry,* 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).  Dismissal of a claim for failure to plead with particularity is proper where

[4] In *Kronenberg* the merger clause provided as follows:  "<u>Entire Agreement.</u> This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied."  872 A.2d at 587, 2004 Del. Ch. LEXIS 77, at \*45.

there are "no facts whatsoever setting forth the time, place, or specific individuals who purportedly made the misrepresentations[.]" *Coley v. North Carolina Nat'l Bank*, 41 N.C. App. 121, 125, 254 S.E.2d 217, 220 (1979).

44.     PRA's allegations of fraud , without question, are sufficiently particular under Rule 9(b).  The allegations state the specific identity of the persons making the statements, the specific content of the statements, and specific dates when the statements were made. (ECF No. 37 at CC, ¶¶ 14–19, 26, 27.)  PRA also has expressly alleged that Plaintiffs' false statements induced PRA's agreement to the APA. Therefore, the Court will not dismiss the fraud in the inducement claim for lack of specificity.

45.     Plaintiffs make the same argument in support of their motion to dismiss the counterclaim for negligent misrepresentation: "[PRA]'s negligent misrepresentation counterclaim must fail because they do not aver specifically <u>what was said</u>, <u>who said it</u>, <u>when it was said</u>, or <u>to whom it was said</u>."  (ECF No. 42, at p. 17; emphasis in original.)  This Court has previously held that "both '[a]llegations of fraud and negligent misrepresentation must be stated with particularity.'" *Rabinowitz v. Suvillaga*, 2019 NCBC LEXIS 8, at *33 (N.C. Super. Ct. Jan. 28, 2019) (quoting *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *20 (N.C. Super. Ct. Jan. 28, 2015) and citing N.C.G.S. § 1A-1, Rule 9(b)); *see also BDM Inv. v. Lenhil, Inc.*, 2012 NCBC LEXIS 7, at *56 (N.C. Super. Ct. Jan. 18, 2012).  The Court already has concluded that the alleged misrepresentations are stated with sufficient particularity as required by Rule 9(b) in the context of the fraudulent inducement

counterclaim. That same analysis applies to the counterclaim for negligent misrepresentation, and Plaintiffs' argument fails.

46. Finally, Plaintiffs argue that the claim for negligent misrepresentation should be dismissed because PRA does not allege that Plaintiffs owed PRA a duty to provide accurate information and has "not alleged that they were denied the opportunity to investigate any aspect of their business arrangement with Plaintiffs, or that [PRA] could not have learned the true facts by exercise of reasonable diligence." (ECF No. 42, at pp. 17–18.) The Court agrees.

47. North Carolina recognizes that a duty of care "may arise between adversaries in a commercial transaction[,]" where the seller "was the only party who had or controlled the information at issue" during the process of negotiations, "and the buyer had no ability to perform any independent investigation." *Roundtree*, 252 N.C. App. at 161, 796 S.E.2d at 832 (quoting *Kindred of North Carolina, Inc. v. Bond*, 160 N.C. App. 90, 584 S.E.2d 846 (2003)) (text modification and quotations omitted). In that case, "the seller owe[s] a duty to the buyer during the course of negotiations to provide accurate, or at least negligence-free financial information about the company[.]" *Id.*

48. PRA does not allege in its counterclaims that Plaintiffs were the only party that "had or controlled the information" relevant to the purchase of the Solution. To the contrary, PRA alleges it is a large, sophisticated CRO who negotiated the APA with Plaintiffs for a period of more than a year, frequently providing Plaintiffs with input as to the functionality required from the Solution and engaging

in regular interactions with Plaintiff during the development of the software. PRA does not allege that Plaintiffs ever denied them information that they requested or denied them opportunity to test the Solution during its development. In fact, at the hearing on the Motion, PRA's counsel conceded that PRA did not ask for demonstration of the Solution at any point during the negotiations and did not ask Plaintiffs to confirm through a demonstration that the ten Product Enhancements had been implemented into the Solution. PRA does not allege that it would have been impossible to determine whether the ten Product Enhancements had been implemented if it had asked for such a demonstration.

49. Similarly, PRA does not allege that it sought to investigate or verify Plaintiffs' claims that the Solution was suitable for large clinical trials or that it could be implemented within eighteen months following the Closing by, for example, asking Plaintiffs for the opportunity to independently inspect or review the software, or for references from other clients for which Plaintiffs had performed software development services or implemented CTMS software. In fact, the counterclaims are devoid of any allegations that PRA undertook any due diligence efforts related to the purchase of the Solution.

50. PRA responds to Plaintiffs' argument by noting that it alleges that it "justifiably relied on [the] false information in entering into the APA." (ECF No. 37, at ¶ 82.) However, the Court is not required to accept this legal conclusion where PRA does not support the statement with factual allegations. *Good Hope Hosp., Inc.*, 174 N.C. App. at 274, 620 S.E.2d at 880. The lack of allegations that PRA "was denied

the opportunity to investigate or . . . could not have learned the true facts by exercise of reasonable diligence" is fatal to it claim for negligent misrepresentation. *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) Therefore, Plaintiffs' motion to dismiss PRA's counterclaim for negligent misrepresentation should be GRANTED.

51. Although not expressly raised by Plaintiffs in their arguments for dismissal of the fraudulent inducement claim, the Court must address the fact that a claim for fraud is subject to the same requirements regarding allegations of due diligence as a claim for negligent misrepresentation. "As to either tort, . . ., when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence. *Hudson-Cole Dev. Corp.*, 132 N.C. App. at 346, 511 S.E.2d at 313 (1999); *Cobb*, 215 N.C. App. at 277, 715 S.E.2d at 549–50 ("Furthermore, any reliance on alleged false representations must be reasonable. Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence but failed to investigate. Justifiable reliance is an essential element of both fraud and negligent misrepresentation." (internal quote omitted)).

52. PRA relies on the same alleged misrepresentations in support of its negligent misrepresentation and fraud claims. As discussed above, PRA does not allege that it was denied an opportunity to investigate the veracity of the misrepresentations or that it could not have learned the true facts by exercising

reasonable diligence. The Court finds no reasoned basis for allowing PRA to pursue the claim for fraudulent inducement while dismissing the claim for negligent misreprentation. Therefore, the Court concludes that Plaintiffs' motion to dismiss PRA's counterclaim for fraudulent inducement should be GRANTED.

### C. Count IV: Breach of Contract (Parthasarathy Employment and Settlement Agreements)

53. PRA alleges that Parthasarathy breached the Parthasarathy Employment Agreement and the Settlement Agreement by focusing on the development of an unrelated mobile application for My Games rather than devoting his "best efforts" to the business of PRA while he was employed by PRA. (ECF No. 37 at CC, ¶¶ 84–91.) Specifically, Defendants allege Parthasarathy breached Section 3(a) of his Employment Agreement, which states, in pertinent part:

> You agree to use your best efforts in support of . . . and devote your full time, skill, attention, and energies to [PRA's] business. During the Employment Period you may not engage in any other business activity which . . . may [ ] interfere with your ability to discharge your responsibilities[.] . . . . [Y]ou may not: (i) work on either a part-time or independent contracting basis for any other company without the prior written consent of the CEO[.]

(ECF No. 8.3 at Ex. C, p. 1.)

54. PRA alleges Parthasarathy's breach of the Employment Agreement also results in the breach of the Settlement Agreement, in which he represented that he had "not breached any provision of the [Parthasarathy] Employment Agreement." (ECF No. 37 at CC, ¶ 85.)

55.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). "[W]here the complaint alleges each of these elements, it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Woolard v. Davenport*, 166 N.C. App. 129, 134, 601 S.E.2d 319, 322 (2004).

56.     Parthasarathy moves to dismiss Defendants' counterclaim for breach of contract (Parthasarathy Employment Agreement) on the grounds that, *inter alia*, the "alleged breaches of the outside business activities provision is [sic] unenforceable, as a matter of law," (ECF No. 42, at pp. 19–23.) The Court need not consider Parthasarathy's argument, however, because PRA has neither alleged nor argued that Parthasarathy's conduct was a breach of the "outside business activities" provision of Section 3(a) of the Parthasarathy Employment Agreement. (ECF No. 37 at CC, ¶¶ 84–91; ECF No. 47, at pp. 21–23.) Instead, PRA alleges Parthasarathy did not devote his full time and attention and best efforts to implementing the Solution for PRA.

57.     PRA has sufficiently pleaded the elements of its breach of contract claim. It is undisputed that the Parthasarathy Employment Agreement and Settlement Agreements existed and constitute contracts. (ECF No. 8.3 at Ex. C; *see also* ECF No. 42, at ¶ 32.) Further, PRA has sufficiently alleged a breach of both agreements, resulting in injury. (*See* ECF No. 37 at CC, ¶¶ 84–91.) Specifically, Defendants allege that by diverting his time, resources, focus, and effort to a mobile tennis application unrelated to implementing the Solution, Parthasarathy failed to use "his best efforts"

to further PRA initiatives, resulting in the failures associated with the implementation of the Solution software. (*Id.*)

58. Accordingly, this Court finds that Plaintiffs' motion to dismiss PRAs' counterclaim for breach of the Parthasarathy Employment Agreement and the Settlement Agreement should be DENIED.

*D. Count V: Tortious Interference with Contractual Relations*

59. PRA brings a counterclaim against Parthasarathy for tortious interference of contractual relations. (ECF No. 37 at CC, ¶¶ 92–99.) To state a claim for tortious interference with contract, a claimant must show:

> (1) a valid contract between the [claimant] and a third person, conferring upon the plaintiff a contractual right against the third person; (2) the [opposing party] knows of the contract; (3) the [opposing party] intentionally induces the third person not to perform the contract; (4) the [opposing party] acts without justification; and (5) the [opposing party's] conduct causes actual pecuniary harm to the plaintiffs.

*Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 604–05, 646 S.E.2d 826, 832 (2007). PRA alleges that Parthasarathy was aware of the confidentiality requirements in the Piccirillo Employment Agreement, that "Parthasarathy wrongfully obtained PRA's privileged and confidential information, including information related to PRA's acquisition of the Solution, by inducing Piccirillo to divulge that information," and that "[u]sing PRA's privileged and confidential information . . . , Parthasarathy wrongfully filed this lawsuit, purporting to know PRA's intentions with respect to its acquisition of the Solution." (ECF No. 37 at CC,

¶¶ 95–97.) PRA further alleges that Parthasarathy acted "without privilege or justification." (*Id.* at ¶ 98.)

60. Plaintiffs move to dismiss the tortious interference claim on the grounds that *Piccirillo* acted without justification in sharing the confidential information with Parthasarathy. (ECF No. 42, at pp. 24–25.) Plaintiffs misunderstand the claim for tortious interference, which requires that PRA establish that the alleged interferer, Parthasarathy, acted without justification. *Pinewood*, 184 N.C. App. at 604. Plaintiffs' argument misses the mark and fails to provide a basis for dismissal of PRA's claim.

61. PRA also argues that the tortious interference claim fails because PRA does not allege the specific confidential information that Piccirillo disclosed in breach of the Piccirillo Employment Agreement. (ECF No. 42, at p. 25.) The Court notes that the allegations underlying this claim appear to be intentionally muddy. PRA alleges that Piccirillo revealed confidential information "including information related to PRA's acquisition of the Solution[.]" (ECF No. 37 at CC, ¶ 95.) PRA further alleges that Parthasarathy used the confidential information to file the lawsuit against PRA. (*Id.* at ¶ 97.)

62. North Carolina is a notice-pleading state, and the Court concludes that the allegations provide "sufficient notice of the claim asserted to enable [Plaintiffs] to answer and prepare for trial[.]" *Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014). Discovery will be necessary to determine precisely what

information Piccirillo learned regarding PRA's intentions during negotiations with Plaintiffs.

63. Therefore, Plaintiffs' motion to dismiss Defendants' counterclaim for tortious interference of contract should be DENIED.

## IV. CONCLUSION

In conclusion, the Motion is GRANTED, in part, and DENIED, in part, as follows:

1. Plaintiffs' motion to dismiss Defendants' first counterclaim for Breach of Contract (APA) is GRANTED, and the claim DISMISSED.

2. Plaintiffs' motion to dismiss Defendants' second counterclaim for fraud in the inducement is GRANTED, and the claim DISMISSED without prejudice.

3. Plaintiffs' motion to dismiss Defendants' third counterclaim for negligent misrepresentation is GRANTED, and the claim DISMISSED without prejudice.

4. Plaintiffs' motion to dismiss Defendants' fourth counterclaim for breach of contract (Parsatharathy Employment & Settlement Agreement) is DENIED.

5. Plaintiffs' motion to dismiss Defendants' fifth counterclaim for tortious interference with contract is DENIED.

SO ORDERED, this the 6th day of September, 2019.

       /s/ Gregory P. McGuire
       Gregory P. McGuire
       Special Superior Court Judge for
       Complex Business Cases